WILLIAM H. BLODGETT, TAX COMMISSIONER, *vs.* BRIDGEPORT CITY TRUST COMPANY, EXECUTOR, (ESTATE OF GREGORY S. BRYAN).

MALTBIE, C. J., HAINES, HINMAN, BANKS AND AVERY, JS.

*Argued November 4th, 1931, reargued April 5th—decided June 14th, 1932.

* For the briefs filed on the reargument of this case, see *Records and Briefs* of the April Term, 1932, Part 1, page 97. *Reporter*.

*Farwell Knapp,* Assistant Tax Commissioner, with whom, on the brief, was *Warren B. Burrows,* Attorney-General, for the appellant (plaintiff).

*William H. Comley,* for the appellee (defendant).

HAINES, J. The defendant is the duly qualified executor of the will and estate of Gregory S. Bryan who died a resident of Washington in this State October 22d, 1929. On or about October 1st, 1930, the executor filed with the tax commissioner a sworn return for the purpose of the computation of the state succession tax as provided by law, and on or about October 3d, 1930, the tax commissioner computed the tax and filed his computation with the Court of Probate. One of the items of the computation was a tax of $35,448.12 upon a bequest and devise to Harvard University provided in the eighth clause of the will as follows: "All the rest, residue and remainder of my estate both real and personal, and wherever situate, I give, devise and bequeath to the Trustees of Harvard University at Cambridge, to be retained as a perpetual memorial, known as the 'Gregory Seeley Bryan' fund or building or professorship or whatever other form the memorial may in the discretion of the Trustees assume." The amount of the residue was determined to be $474,642.34.

Thereafter on October 17th, 1930, the Court of Probate after hearing, disallowed the proposed tax upon the bequest and devise in question and held it untaxable; and on November 5th following, the tax commissioner appealed from the action of the Court of Probate to the Superior Court in Litchfield County and by agreement of parties the case was reserved for the advice of this court.

The parties have stipulated that "The President and

Fellows of Harvard College (often referred to as the 'Trustees of Harvard University') is a non-stock corporation existing under the laws of the Commonwealth of Massachusetts, and organized under an Act of the General Court of said Commonwealth passed in 1650 and entitled 'The Charter of the President and Fellows of Harvard College,' which was amended by an Act of said General Court passed in 1657 and entitled 'An Appendix to the College Charter,' and was confirmed by an Act passed by the General Court in 1707 entitled 'Extract from a Resolve of the Provincial General Court, passed A. D. 1707, Declaring the College Charter of 1650 Not Repealed,' etc., and by Articles of the Constitution of the Commonwealth of Massachusetts adopted in 1780.

"Said corporation was in good faith formed for charitable and educational purposes, and from the date of its organization to the present time has been conducted in good faith solely as a charitable and educational institution exclusively for the purposes for which it was incorporated.

"Said corporation has no shareholders. No officer, member, fellow, overseer or employee of said corporation has ever received or has ever claimed to receive from said corporation any share, directly or indirectly, of any pecuniary profit or financial advantage derived from the exercise by said corporation of its corporate powers, or from the investment and management of its funds and properties, except reasonable compensation for services rendered in effecting one or more of the purposes for which said corporation was organized, or as proper beneficiaries of a strictly charitable purpose.

"Said corporation, neither directly nor indirectly, owns or controls any money, securities, or other assets

except such as have been given to it charged with a trust to use the same to promote education."

The questions of law raised by this appeal are agreed upon and stated in various ways, but they present, essentially, one question only: Whether under the statute law of this State, the bequest and devise to Harvard College in the eighth clause of the will as quoted, is subject to a succession tax?

At the date of the death of the testator, October 22d, 1929, the provisions of our statute law governing succession and transfer taxes were contained in Public Acts of 1929, Chapter 299, which became General Statutes, Rev. 1930, § 1367. The applicable provisions of that section were as follows: "There shall be exempt from the tax imposed by this chapter all transfers to or for the use of . . . any corporation, institution, society, association or trust, wheresoever incorporated or organized, formed for charitable, educational, literary, scientific, historical or religious purposes, provided the property transferred is to be used exclusively for one or more of such purposes; but no such transfer shall be so exempt if any officer, member, shareholder or employee of such corporation, institution, society, association or trust shall receive or may be lawfully entitled to receive any pecuniary profit from the operation thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiaries of a strictly charitable purpose . . ." In the Court of Probate and upon the appeal to the Superior Court, this was the only question presented: As to whether the gift to Harvard College was or was not exempt from taxation under the provisions of Public Acts of 1929, Chapter 299, § 8, now General Statutes, § 1367, in force at the time the decree was entered in the Court of Probate?

Upon the stipulated facts, this gift would clearly be

exempt under the first clause of the Act in question. The uncertainty arises under later provisions of the Act, which deny exemption if any officer, member, shareholder or employee "shall receive or may be lawfully entitled to receive any pecuniary profit from the operation" of the institution.

The appellant rests his contention that the gift is taxable upon our decision in *Canterbury School, Inc.* v. *New Milford,* 111 Conn. 203, 149 Atl. 685. In that case we were dealing with a property tax and with a corporation without capital stock formed under the statute law of this State. The tax statute there involved was Chapter 319 of the Public Acts of 1927 (now General Statutes, § 1163), which exempted the property of Connecticut corporations "organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes. . . . provided (a) any officer, member or employee thereof does not receive or at any future time shall not receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiary of its strictly charitable purposes."

The appellant calls attention to the similarity of language in that Act and the one now under consideration. He avers that this similarity is the important feature of his case and draws the inference that the intent of the legislature was the same in both Acts; and therefore claims the reasoning and conclusion in the *Canterbury School* case controls the present situation and renders the decree of the Court of Probate erroneous. A careful reading, however, shows a dissimilarity in one important particular which is the very feature of the Act of 1927 which our decision

turned upon. That Act referred specifically to profit from the operation of the school either (1) presently or (2) at any future time, and we held that since it did not appear that profit might not be obtained at some future time, the second requirement was not met and the exemption could not be allowed. The statute now in question was passed two years later, obviously with the Act of 1927 before the framers. If their intent was the same as in the Act of 1927, it would have been natural to follow its language in this respect as it was followed so carefully in others. On the contrary, instead of including in the proviso of the 1929 Act a specific reference to both *present* and possible *future* profit, the exemption is refused if any officer, member or employee "shall receive or may be lawfully entitled to receive" a profit. It is also to be noted that the 1927 Act provided for a tax upon property already held by the corporation, a tax to be continuous in its operation and extending indefinitely into the future, while the 1929 Act provides for a tax on gifts made to the institution by a donor which is to be paid presently and once for all.

We recognize that statutory provisions for tax exemptions are generally to be construed *strictissimi juris,* but this rule "will not be pushed to the extent of·unreasonableness. It is the duty of the court to ascertain and carry out the intent of the legislature." 26 R. C. L. p. 314. Light is thrown upon the scope of the legislative purpose in the Act of 1927 by the provisions of the Act which preceded it and with which it was apparently intended to be in substantial accord though couched in briefer language—Chapter 245 of the Public Acts of 1925. That statute provided that specified institutions should be exempt from a tax upon their property provided such property was permanently devoted to the purposes specified and pro-

vided they were so organized and their property so held that their members could not by any possibility receive for their personal use any of the corporate property in the event of the dissolution of the corporation or receive any profit from their membership; and that real estate owned and actually occupied and used by the corporation and reasonably necessary to carry out one or more of its purposes, should be exempt, provided none of the income, profits or property owned by the corporation was so accumulated or held as to be capable of distribution among its shareholders or members, or used or appropriated for other than one or more of the specific purposes set forth in the statute.

We said of the Act of 1927: "One cannot consider this Act in the light of its history . . . without at once coming to the conclusion that when it makes it a requirement for securing an exemption that any officer, member or employee 'does not receive, or at any future time shall not receive any pecuniary profit' except reasonable compensation for services or as a beneficiary of the charitable purposes of the corporation, it does not intend as the test of exemption the fact of such profit being received but rather the constitution of the organization in such a way that no officer, member or employee can receive pecuniary profit except as stated." *Canterbury School, Inc.* v. *New Milford,* 111 Conn. 203, 207, 149 Atl. 685. We reaffirmed this view of the legislative intent in the case of *Pomfret School* v. *Pomfret,* 105 Conn. 456, 136 Atl. 88, and also what had been said in *Brunswick School* v. *Greenwich,* 88 Conn. 241, 90 Atl. 801, that as a condition of exemption, there must be "a sequestration of the property claimed to be exempt from private, and a devotion of it to public, use," and that "in ascertaining whether this essential element is present, the deter-

minative questions are: First, is the property devoted to the public use; second, was the property so received and is it so held as to be dedicated to the public benefit instead of to private advantage or gain? Is it 'taken out of the body of private property and devoted exclusively to the common good'?" This test was again affirmed in the case of *Female Academy* v. *Darien*, 108 Conn. 136, 142 Atl. 678. The Canterbury School organization was considered with these principles in mind. It was organized under General Statutes, Rev. 1918, § 3534, as amended by Public Acts of 1919, Chapter 65. That law provided for the formation of corporations without capital stock to promote or carry out "any lawful purpose, other than that of a mercantile or manufacturing business, or a business conducted solely for profit." It was at once apparent that the corporation so organized was authorized to conduct any kind of business not within the excepted classes and make an incidental profit without any limitation upon its authority to distribute those profits among its members.

The nature of the corporate power conferred upon the Canterbury School was thus obviously and radically different from that of Harvard College or of Yale, Wesleyan or Trinity in this State. These are institutions of a strictly public character and it is impossible to find in their chartered powers any authority to so conduct as to make and divide a profit. They are not authorized to "carry out any lawful purpose, other than that of a mercantile or manufacturing business, or a business conducted solely for profit." Harvard College was founded in 1636 by a vote of the General Court of the Colony of Massachusetts Bay, when an initial appropriation of public funds of four hundred pounds was made for the purpose. The opening provisions of its charter, granted in May, 1650,

read: "Whereas, through the good hand of God, many well-devoted persons have been, and daily are, moved and stirred up to give and bestow sundry gifts, legacies, lands and revenues, for the advancement of all good literature, arts, and sciences, in HARVARD COLLEGE, in Cambridge, in the county of Middlesex, and to the maintenance of the President and Fellows, and for all accommodations of buildings, and all other necessary provisions that may conduce to the education of the English and Indian youth of this country in knowledge and godliness, . . . It is therefore ordered and enacted by this Court and the authority thereof, that for the furthering of so good a work, and for the purposes aforesaid, from henceforth that the said College in Cambridge, in Middlesex, in New England, shall be a Corporation . . ." Through all the amendments and changes in its chartered powers to the present time this single and exclusive purpose of organization has been reaffirmed, and under the Constitution of the Commonwealth in 1780 these powers were secured to it perpetually, as follows: "ARTICLES OF THE CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS, CONFIRMING AND SECURING TO HARVARD COLLEGE THE PERPETUAL POSSESSION AND ENJOYMENT OF ALL ITS ESTATE, RIGHTS, POWERS, AND PRIVILEGES." "Whereas our wise and pious ancestors, so early as the year one thousand six hundred and thirty-six, laid the foundation of Harvard College, in which University many persons of great eminence have, by the blessing of God, been initiated in those arts and sciences which qualified them for public employments both in Church and State; and whereas the encouragement of arts and sciences and all good literature tends to the honor of God, the advantage of the Christian religion, and the great benefit of this and the other United States of America,—It is declared that

the President and Fellows of Harvard College in their corporate capacity, and their successors in that capacity, their officers and servants, shall have, hold, use, exercise, and enjoy all the powers, authorities, rights, liberties, privileges, immunities, and franchises which they now have, or are entitled to have, use, exercise, or enjoy; and the same are hereby ratified and confirmed unto them . . ."

With the entire stipulation before us, it is apparent that Harvard College is and always has been a strictly and exclusively public charitable and educational institution, and that any change in its purpose to one where it was operated for profit would be beyond its chartered powers; that it received its initial endowment in public funds and that all its property since acquired and now held has been and now is "charged with a trust to use the same to promote education," and that no officer, member, fellow, overseer or employee has received, is receiving or claiming any profit from the operation thereof; and the very gift in question is required to be retained as a "perpetual memorial" in furtherance of the educational purposes of the institution.

If we apply the test of exemption which we laid down in our former decisions which we have quoted, there can be no fair question but that the property of Harvard College is sequestrated from private and devoted to the public use; that it was received and is now held dedicated to the public benefit instead of to private advantage or gain, and is taken out of the body of private property and devoted exclusively to the common good.

We decide that this gift to Harvard College is not subject to the proposed tax under the provisions of the Act of 1929.

Just prior to the date of the reservation to this

court, Chapter 274 of the Public Acts of 1931 (now General Statutes, Cum. Sup. 1931, § 243a) became effective. It provided that: "There shall be exempt from the tax imposed by this chapter all transfers to or for the use of . . . any corporation, institution, society, association or trust, incorporated or organized under the laws of this state or of any state whose laws provide a similar exemption of transfers to any similar Connecticut corporation, institution, society, association or trust, formed for charitable, educational, literary, scientific, historical or religious purposes, provided the property to be transferred is to be used exclusively for one or more of such purposes; but no such transfer shall be exempt if at the time such transfer occurred, any officer, member, shareholder or employee of such corporation, institution, society, association or trust shall be receiving or shall previously have received any pecuniary profit from the operation thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiaries of a strictly charitable purpose . . . The provisions of this section shall apply to all suits and proceedings pending for the collection of any taxes due to the state . . ." And the benefit of the exemption so far as such institutions organized in other States is concerned is limited to such States as grant a similar exemption to institutions in this State. It is now suggested that this Act, being retroactive in terms, may be applicable to the present case, and the appellee replies that if it has any such application, it is unconstitutional.

The question of the applicability and effect of the Act of 1931 is presented for the first time when the case reaches this court. It was not of course involved in the consideration given to the matter in the Court of Probate, nor in any of the grounds of appeal from

that decree. However, the Act becoming effective just prior to the date of the reservation by the Superior Court, counsel stipulated that it should be included in considering the question of exemption here presented. Notwithstanding this, the appellant did not press any claim that the Act of 1931 had controlling effect upon the question presented, but referred to it only as "a matter of interest, though not having any particular weight in the present case," and treated the Act of 1929 as controlling the question submitted to us. The appellee did file a supplemental brief in which it was claimed (a) that the Act of 1931 had no application in this case, and (b) that if it did apply in terms, then, in so far as this case was concerned, it was unconstitutional as impairing vested rights of property. In this state of the record we suggested a reargument upon the applicability and effect of the Act of 1931, pursuant to which further arguments were made and briefs filed, and by agreement of counsel, the stipulation was amended by adding the statement that the bequest to Harvard College, with the exception of $40,000, was in fact turned over and delivered to the College by the executor before the Act of 1931 became effective.

The present claim of the appellant is that the Act of 1931 was intended by the legislature to apply to a case of this kind, while the appellee reasserts the position taken in its former supplemental brief that it was not so intended, and that if, in terms, it did apply, it would be unconstitutional in so far as this case is concerned.

A part of § 3 of the Act reads: "This Act shall take effect from its passage and shall apply to all suits and proceedings pending for the collection of any taxes due to the State." It cannot fairly be said that this suit and proceeding for the collection of a succession tax, was not pending within the meaning and intent of that

provision when the Act became operative. The language used is free from ambiguity and indicates a legislative intent to bring within its terms all proceedings for the collection of succession taxes which were not fully completed and determined at that time. We may fairly say, in the language of the court in the case of *Estate of Pederson,* 198 Iowa, 166, 196 N. W. 785: "The language of the Act is clear, definite, and specific. . . . We cannot inquire in this proceeding into the motives which actuated the legislature. The General Assembly in its wisdom has seen fit to frame the statute in this manner, and we have no other alternative than to apply the statute as we find it written, according to its definite, specific, and unambiguous terms."

If it be conceded that the withdrawal of an exemption amounts to the same thing as the imposition of a new or additional tax, the question is whether the General Assembly has the power to impose a tax on a succession while the personal property of the decedent is in the possession of the executor, when the death of the decedent took place before the enacting statute became operative. In the present case, the imposition of a tax in any event rests upon the affirmative provisions of the Act of 1929, Chapter 299, now Chapter 77 of the General Statutes, §§ 1360-1401. The application of the Act of 1931, now General Statutes, Cum. Sup. 1931, § 243a, could only have the effect of withdrawing the exemption and leaving the bequest in question liable to a tax under the Act of 1929.

Due to a failure in many jurisdictions to accurately distinguish the different forms which this species of taxation assumes and to recognize the fundamental principles upon which each is based, many of the statutory enactments and decisions upon the subject of inheritance taxes or death duties are in hopeless conflict, making accurate analogies difficult to draw even

with the most careful differentiation. We are materially aided, however, by the learned and able briefs of counsel in the discussion of the particular features of the subject now before us.

Since the right to transmit or receive property upon the death of the owner is not an inherent right but purely a privilege granted by the State, it is obvious that that privilege may be abridged or coupled with conditions at the will of the State. Since the first inheritance tax law was passed in this country in the State of Pennsylvania in 1826, nearly every State has adopted this species of taxation in some form by imposing what are often broadly termed death duties, a comprehensive term which has been defined as an exaction by the State to be collected from property left by a deceased person, while in its custody, prescribed upon the occasion of his death and the consequent devolution of his property by the force of its laws. *Hopkins' Appeal,* 77 Conn. 644, 649, 60 Atl. 657; Pinkerton & Millsaps, Inheritance and Estate Taxes, p. 16, § 19, § 21. It is " 'an exaction made by the State in the regulation of the right of devolution of property of decedents, which is created by law, and which the law may restrain or regulate'." *Nettleton's Appeal,* 76 Conn. 235, 241, 56 Atl. 565; *Matter of Sherman,* 153 N. Y. 1, 4, 46 N. E. 1032.

In our own State, from the initial legislation on the subject in 1889 to the present time, our statutes have been variously entitled and framed, but in 1929, by Chapter 299, the title was made to read "An Act concerning Succession and Transfer Taxes," and the levy was referred to as a levy upon "transfers" of property rather than in terms upon the property itself. The distinction is of importance in the scheme of inheritance taxation, and the present enactment conforms to the view of a learned textwriter who refers to the ex-

isting confusion in nomenclature and says that "perhaps the whole subject would more aptly be described as 'Transfer Taxes'." Gleason & Otis, Inheritance Taxation (4th Ed.) p. 242, § 1.

A casual reading of our earlier statutes might give the impression that the tax was imposed upon the property of the decedent rather than upon the transfer of the title to another, as is now more accurately stated in the statute of 1929, yet it will be apparent from our former decisions that the underlying theory of the General Assembly has remained unchanged. Our statutes did not and do not provide for a levy upon the property of the decedent but upon the right of succession to the property, and the value of the property passing is only used as a measure of the tax. It is strictly an excise tax as distinguished from a property tax. The specific terms in which our statutes are now framed, make it unnecessary to consider a distinction sometimes made between the privilege to transmit and the privilege to receive the property. Our tax is of the latter class. *Silberman* v. *Blodgett,* 105 Conn. 192, 201, 134 Atl. 778; *Blodgett* v. *New Britain Trust Co.,* 108 Conn. 715, 720, 145 Atl. 56; *Corbin* v. *Townshend,* 92 Conn. 501, 503, 103 Atl. 607; *Warner* v. *Corbin,* 91 Conn. 532, 536, 100 Atl. 354; *Blodgett* v. *Guaranty Trust Co.,* 114 Conn. 207, 217, 158 Atl. 245; 37 Cyc. p. 1553, note 60.

The appellant cites many authorities to support the proposition that "States have power to subject property in process of administration, to taxation, even though the decedent dies before the enactment of the statute." The proposition as thus stated is a sound one and the authorities quoted sustain it. While the property of a decedent is under administration and so in control of the State, there can be no doubt of the right of the State to impose a property tax upon it; but

as we have indicated, we are not concerned with a tax upon the personal property of Mr. Bryan but with a tax upon the right to succeed to the ownership of that property, and the question presented therefore is whether the State's control of the property during administration permits it to impose a tax on the privilege during that period.

It has been a recognized rule with strictly legal sanction, that the right of inheritance or succession becomes fixed and determined at the moment of the death of the owner, and although distribution occurs a considerable time thereafter, it relates back to the date of the death as the time when the right of the beneficiary became fixed. *Kingsbury* v. *Scovill,* 26 Conn. 349, 352; *Holcomb* v. *Sherwood,* 29 Conn. 418, 420; *Hale's Appeal,* 69 Conn. 611, 617, 38 Atl. 392; *Ward* v. *Ives,* 75 Conn. 598, 601, 54 Atl. 730.

But though the *right* matures at the decedent's death, yet the nature of the interest thus created depends upon the character of the property to which the right of succession is granted. It has been recognized in a long line of concurring decisions in this and other States, that the legal title to real estate passes to the beneficiary at the moment of the decedent's death, while the legal title to his personal property vests, not in the beneficiary but in the executor or administrator, as the case may be, and the right which accrues to the beneficiary upon the death of the decedent is purely equitable. *Greene* v. *King,* 104 Conn. 97, 102, 132 Atl. 411; *McAdams* v. *Starr,* 74 Conn. 85, 49 Atl. 897; *Johnes* v. *Jackson,* 67 Conn. 81, 34 Atl. 709; *Marcy* v. *Marcy,* 32 Conn. 308; *Beecher* v. *Buckingham,* 18 Conn. 110; *Gray* v. *Goddard,* 90 Conn. 561, 98 Atl. 126; Cleaveland, Hewitt & Clark, Conn. Probate Law & Practice, p. 230, and numerous cases in the note thereto.

Not having the legal title during the period of administration, the beneficiary cannot convey title to a third party, though he may convey such interest as he has; on the other hand, the legal title being in the executor, the latter can convey it or make other proper use of it, such as paying the expenses of administration, or taxes, or other charges, and in case of suits involving it, he and not the beneficiary is the proper party to the action. Cleaveland, Hewitt & Clark, *supra,* pp. 207, 230, 335, 338, with relevant Connecticut cases.

It is only upon the delivery of personal property to the beneficiary through legal distribution after administration is complete, that he acquires the legal title to it. By the act of distribution the title vests and the beneficiary becomes, for the first time, the legal owner of the property. It is distribution, not the death of the decedent, which transfers the title and ownership of personalty to the beneficiary. *Greene* v. *King,* 104 Conn. 97, 102, 132 Atl. 411; *Griswold* v. *Bigelow,* 6 Conn. 258, 266; *Roorbach* v. *Lord,* 4 Conn. 347; Cleaveland, Hewitt & Clark, *supra,* p. 818.

Our statute of distribution "is at the same time a statute of descent and of administration. As a statute of descent it defines the heirs of an intestate, and vests in those heirs the *right* of property in his estate at the time of his death. As a statute of distribution it prescribes the mode by which possession of the property may be obtained, and postpones the vesting of the strictly legal title in personal property, until possession is given through the process of distribution; the right of property, however, pending distribution, may pass by sale, bequest, or descent." *Hale's Appeal,* 69 Conn. 611, 617, 38 Atl. 392.

Our succession taxes, so-called, "differ from taxes, properly speaking, in that they are exactions in the

nature of death duties 'to be paid to the State upon the occasion of death and the consequent transfer of ownership in the property of the decedent, through the intervening custody and administration of the law, to the persons designated by the law, through the statutes regulating wills, descents, and distributions.' " *Warner* v. *Corbin*, 91 Conn. 532, 536, 100 Atl. 354; *Silberman* v. *Blodgett*, 105 Conn. 192, 201, 134 Atl. 778; *Hopkins' Appeal*, 77 Conn. 644, 649, 60 Atl. 657; *Gallup's Appeal*, 76 Conn. 617, 620, 57 Atl. 699. So that where a beneficiary, during administration, conveys away his interest, the distribution will nevertheless be made to him as though the transfer had not been attempted. *Holcomb* v. *Sherwood*, 29 Conn. 418, 420.

These principles are firmly established by the decisions of our own and many other States, and it is unnecessary to discuss them further.

Turning now to our statute and recalling that it imposes the tax upon the "transfer" of the property, it is clear that we must determine what transfer was in contemplation by the legislature in framing the statute; whether it refers to the equitable right which the beneficiary acquired in the personal property at the death of the decedent, or to the transfer of complete ownership which is perfected only by distribution. The right acquired by the beneficiary at the time of the decedent's death is clearly not in any true sense a "transfer," but only a right to receive an ultimate transfer of the complete ownership upon distribution. We regard the word "transfer" used in our statute, as including the entire process by which this complete and unconditional ownership is acquired. An indication of this legislative intent is found in the language used in certain other portions of the Act. Thus, in providing for the succession tax upon personal prop-

erty standing in the joint names of the decedent and another, it is provided that the right of the survivor or survivors to the immediate ownership or possession and enjoyment of such property shall be a "taxable transfer." General Statutes, § 1362. So it is provided that gifts or grants of property, intended to take effect in possession or enjoyment at or after the death of the donor, are "taxable transfers," subject to the tax upon succession. General Statutes, § 1361.

In other words, we do not regard the full succession as having taken place upon the death of the decedent. The right to the ultimate title and ownership did arise at that time, and may be said to have vested in the beneficiary, but that was but one step in the process of succession, and the beneficiary does not become the actual and unconditional owner of the property until the estate has been administered and legally distributed and the succession consummated; not until then does he enjoy the privilege which the State has granted him, and upon which it is imposing the tax.

We took cognizance of this legislative intent in taxing succession in this State, in *Nettleton's Appeal,* 76 Conn. 235, 56 Atl. 565, wherein JUSTICE HAMERSLEY said (p. 245): "Such exaction is due and collectible during the interim that the property is in the custody of the law; that is, after death has destroyed the possession of its owner and before final possession is given to the new owners designated by the law," and he adds: "Nor is it material to the essence of the tax at what time it is ascertained and collected during the passage of the property, through the channel of the law, from the dead to the living; whether the property is tapped as it falls from the lifeless hand, or midway in its course, or as it passes into the grip of the new owner."

We are therefore in accord with what we deem to be

the soundest reasoning of some of the most important cases in other jurisdictions. Thus in *Magee* v. *Commissioner of Corporations & Taxation,* 256 Mass. 512, 153 N. E. 1, at page 516, Chief Justice Rugg says: "There are numerous cases which show that the estate of a decedent is within the power of the State for taxation purposes until actual distribution to the persons entitled to receive it. . . . Nevertheless, the possession and enjoyment of the property in the case at bar had not actually passed to the beneficiaries at the time of the enactment of the statute under which the excise was levied. . . . Doubtless the right to share in the estate, real and personal, according to the terms of the will vested in the beneficiaries of the direct gifts immediately on the death of the testatrix. . . . To that extent all the rights involved were vested. The . . . succession, however, had not come to an end until after the statute became effective . . . . the . . . . succession was not complete as to the element of possession and enjoyment of the property passing. . . . . The estate was in the custody of the law for the purpose of settlement to be accomplished in the future, and hence the succession was not at an end."

Similar reasoning underlies those opinions of which the following are sufficiently illustrative: *Carpenter* v. *Pennsylvania,* 58 U. S. (17 How.) 456, 462, 463; *Orr* v. *Gilman,* 183 U. S. 278, 22 Sup. Ct. 213; *Knowlton* v. *Moore,* 178 U. S. 41, 20 Sup. Ct. 747; *Moffitt* v. *Kelly,* 218 U. S. 400, 31 Sup. Ct. 79; *Cahen* v. *Brewster,* 203 U. S. 543, 27 Sup. Ct. 174; *United States* v. *Jones,* 236 U. S. 106, 35 Sup. Ct. 261; *Gelsthorpe* v. *Furnell,* 20 Mont. 299, 51 Pac. 267; *Montgomery* v. *Gilbertson,* 134 Iowa, 291, 111 N. W. 964; *Estate of Pederson,* 198 Iowa, 166, 196 N. W. 785.

We hold that it was competent for the legislature to

modify or change the provisions of the succession or transfer tax statute, at any time before the administration of Mr. Bryan's estate was completed and final distribution accomplished, and that full control and power to tax remained in the legislature while his property was *in custodia legis.*

It is called to our attention by the amendment to the stipulation and in argument, that after this appeal from the decision of the Court of Probate had been taken and before the Act of 1931 became operative, the preliminary account of the executor was accepted by the Court of Probate; that at that time, April 11th, 1931, all bequests, special and general, had been paid and there remained in the hands of the executor only the residuary fund, and that on April 15th, 1931, the executor turned this fund over and delivered it to Harvard College, reserving $40,000 however, for the payment of the succession tax if its imposition was sustained by this court.

It is now suggested that even if the Act of 1931 is held to apply in the present case, only $40,000 being now under the control of the executor, the resulting tax, if any, must be assessed upon the $40,000 only. This contention loses sight of the distinction we have emphasized between a tax upon property and a tax upon the right of succession to property. It is true that Harvard College acquired title to so much of the fund as was paid over to it on April 15th, but it acquired it on the mutual understanding of the parties, and took it with the condition, that the tax, if any, upon its right to succeed to the entire residue of the estate, if imposed, should be paid, and we can see no warrant for computing that tax by any other measure than the value of the entire fund to which the College succeeded. Certainly the $40,000 is not the measure

of the right of succession. A very similar contention was made and overruled in *Montgomery* v. *Gilbertson*, 134 Iowa, 291, 111 N. W. 964. "Before a distribution valid for all purposes—one that will put an end to the settlement of the estate and the power of the court—can be made in either of the statutory modes, the estate to be distributed must be first ascertained by that court, by the settlement of the administration account, and the deduction of the ascertained expenses and charges. This is a condition precedent to such a distribution as will put an end to the jurisdiction of the Court of Probate over the unsettled administration account." *Mathews' Appeal,* 72 Conn. 555, 559, 45 Atl. 170.

The Act of 1929, as we have seen, exempts Harvard College from the succession tax. The Act of 1931, becoming effective before final distribution has taken place, operates to withdraw that exemption for lack of reciprocity in the statutes of the State of the beneficiary's domicil.

The contention that this Act of 1931, which became operative only after the death of Mr. Bryan, cannot constitutionally affect the rights of Harvard College, could only be sustained if we were able to hold that the title and ownership of this fund passed to the College upon the death of Mr. Bryan and became at once fully vested and the succession complete. Since we cannot so hold, it follows that the Act of 1931, becoming effective before succession was consummated, has a legitimate operative effect in withdrawing the exemption which the College would otherwise have enjoyed under the Act of 1929.

To the controlling question presented to us by this reservation and stated in an earlier portion of this opinion, we answer: The gift to Harvard College pro-

vided by the will of Gregory S. Bryan, is subject to a succession tax under the statute law of this State.

No costs shall be taxed in this court.

In this opinion the other judges concurred.